IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DONNA SPANGLER MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV992 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Donna Spangler Moore ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income Benefits, alleging a disability onset date of June 26, 2009. (Tr. at 205-13.)[1] Her applications were denied initially on February 22, 2011, and upon reconsideration on May 19, 2011. (Tr. at 111-51, 154-60.) Thereafter, Plaintiff requested an administrative hearing de

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #6].

novo before an Administrative Law Judge ("ALJ"). (Tr. at 161-62.) Following the subsequent hearing on January 18, 2013, the ALJ issued a decision finding Plaintiff not disabled within the meaning of the Act. (Tr. at 17-30). On October 3, 2014, the Appeals Council denied review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

## II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds

_____

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial activity since her alleged onset date. She therefore met her burden at step one of the sequential evaluation process. The ALJ noted that Plaintiff had minimal earnings from her continued part-time employment as a legal assistant, but those earnings of $4,423 in 2010 and $5,540 in 2011 did not rise to the level of substantial gainful activity. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: rheumatoid arthritis with degenerative changes in multiple joints, hepatitis C, obesity, and diabetes mellitus, type II. (Tr. at 19.) The ALJ found at step three that none of these impairments, singly or in combination, met or equaled a disability listing. (Tr. at 20-21.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with the following additional limitations: "she can stand for only a total of four hours in an eight-hour working day; can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; can never kneel, crouch, and crawl; can frequently grasp and finger; must avoid tasks involving repetitive motion of the

bilateral upper extremities; and must avoid concentrate exposure to hazards such as dangerous machinery and unprotected heights." (Tr. at 21.) In particular as to Plaintiff's rheumatoid arthritis, the ALJ noted that Plaintiff's rheumatoid arthritis was "predominantly 'stable' at least through mid-2011" (Tr. at 23), and her "arthritic symptoms were predominantly controlled through mid to the end of 2011" (Tr. at 25). The ALJ noted that after mid to late 2011, "the treatment notes document an increase in reported symptoms and do include some objective findings." (Tr. at 25.) However, the ALJ ultimately concluded that "the evidence of record as a whole indicates the claimant was capable of maintaining a fairly active lifestyle despite her impairments" (Tr. at 25), and "[a]lthough the evidence documents increased symptoms and findings from the end of 2011 forward, the undersigned has found it particularly instructive that the claimant testified she has continued to work and perform activities of daily living despite her impairments" (Tr. at 28). Because the ALJ determined, at step four, that the demands of Plaintiff's past relevant work did not exceed her RFC, he ultimately concluded that she was not disabled under the Act. (Tr. at 29.)

Plaintiff now argues that substantial evidence fails to support the ALJ's decision. Specifically, she contends that the ALJ failed to analyze two opinions offered by her treating rheumatologist, Dr. Beth Jonas, in accordance with Social Security Ruling ("SSR") 96-2p and 20 C.F.R. §§ 404.1527(c) and 416.927(c), better known as the "treating physician rule." The treating physician rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. See SSR 96-2p, 1996 WL 374188, at *5; 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96-2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").

Opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

In the present case, Dr. Jonas submitted two opinions regarding Plaintiff's limitations. In the first, dated August 10, 2011, Dr. Jonas indicated that Plaintiff's rheumatoid arthritis "has been treated aggressively with a combination of medications including hydroxychloroquine, sulfasalazine, and adalimumab," but that, despite Plaintiff's compliance with therapy and follow up visits, "she continues to have significant functional limitations due to RA." (Tr. at 455.) Dr. Jonas further noted that, as of that date, Plaintiff was "able to work 4 hours per day, 3 days per week." (Id.)

In her second medical source statement, dated January 14, 2013, Dr. Jonas provided an updated and more detailed opinion regarding Plaintiff's functional limitations, indicating that Plaintiff is unable to (1) "perform repetitive tasks using her arms or hands due to active inflammation of the joints," (2) "grip, finger, or handle for more than 1 hour at a time," (3) "lift more than 10 pounds on a regular basis," (4) "stand or walk for more than 30 minutes at a time for more than 2 hours," or (5) work without frequent breaks and rest due to "profound fatigue." (Tr. at 501.) Dr. Jonas concluded that, because Plaintiff's arthritis "continues to be poorly controlled" despite aggressive treatment, she was unable to work. (Id.)

After recounting Dr. Jonas' opinions, along with her treatment notes, the ALJ accorded the opinions partial, rather than "great or controlling," weight. (Tr. at 23-27.) With respect to the 2011 opinion, the ALJ found that Dr. Jonas' 2011 statement did not include a function-by-function analysis of Plaintiff's limitations and appeared to be based on Plaintiff's subjective

complaints. (Tr. at 27.) With respect to the 2013 opinion, the ALJ concluded that Dr. Jonas' assessment of Plaintiff's abilities was "not consistent with the claimant's reported activities of daily living, which include continuing to work on a part-time basis, caring for her children, cooking, driving, and performing light house work" as well as Plaintiff's statement "in her function report that she could 'maybe' lift up to twenty pounds." (Tr. at 27.)

Plaintiff now argues that the ALJ's explanation for according Dr. Jonas' opinions partial weight "is inappropriate and not supported by substantial evidence." (Pl. Br. [Doc. #10] at 11.) Specifically, she contends that the ALJ failed to (1) "elaborate on what part of the letters and functional restrictions are given partial weight" or (2) "acknowledge that Dr. Jonas is a specialist." (Id. at 10.) Contrary to Plaintiff's latter assertion, the ALJ clearly identified Dr. Jonas as Plaintiff's rheumatologist, and, therefore, a specialist. (Tr. at 23, 27.) He also acknowledged the length and extent of Dr. Jonas' treating relationship with Plaintiff in accordance with 20 C.F.R. §§ 404.1527(c) and 416.1527(c). However, the ALJ did not specify what parts of Dr. Jonas' opinions were given weight, or otherwise identify how the opinions were given "partial weight." Moreover, in weighing Dr. Jonas' January 2013 opinion, the ALJ relied heavily on inconsistencies between the 2013 opinion and Plaintiff's reported activities and state agency assessments from two and three years earlier, in 2010 and early 2011. Relying on evidence from 2010 and early 2011 to discount Dr. Jonas' later 2013 opinion is potentially problematic in this case given that (1) the ALJ acknowledged a documented increase in Plaintiff's symptoms and clinical findings from the middle or end of 2011 forward (Tr. at 25, 28); (2) the State agency consultants identified an increase in limitations between their assessments in February 2011 and May 2011; (3) Plaintiff's description of her part-time

9

position in 2012 and 2013 and a letter from her employer in 2012 reflect a decreasing ability to work even on a limited basis; and (4) Plaintiff's description of her activities of daily living in a July 2011 report and at the hearing in 2013 reflects greater limitations than her 2010 function report. (Tr. at 28, 272-277.) With respect to this issue, the most recent State agency assessment, which the ALJ assigned "greater weight," reflects Plaintiff's limitations as of May 2011, and no opinions from any source other than Dr. Jonas post-date this assessment. (Tr. at 28.) The ALJ identified no clinical or opinion evidence from 2012 or 2013 that conflicted with Dr. Jonas' January 2013 opinion. Where, as here, evidence indicates that Plaintiff's impairment worsened during the relevant timeframe, there is a question whether substantial evidence supports the ALJ's decision to discredit Dr. Jonas' 2013 opinion in favor of evidence or opinions from 2009 through early 2011. See, e.g., Collins v. Colvin, No. 12CV1021 EJM, 2013 WL 833539, at *1 (N.D. Iowa Mar. 6, 2013) (stating that "[w]hile [the treating psychiatrist's] opinion as set forth in the August 5, 2010 questionnaire might not be consistent with plaintiff's condition even a few years before, it is not inconsistent with a worsening condition, reflected in more recent treatment notes . . . as well as the questionnaire. The ALJ erred in discounting the long term treating physician's more recent views based upon inconsistencies with earlier views and treatment notes, in light of the treating physician's observation as to plaintiff's apparent worsening condition."); Valley v. Astrue, No. 3:11-CV-260-HEH, 2012 WL 3257861, at *16 (E.D. Va. June 22, 2012) (finding the ALJ's decision was not supported by substantial evidence to the extent that the ALJ relied on early evidence to discount a later treating physician's opinion without adequately accounting for the plaintiff's deteriorating condition) report and recommendation adopted, No. 3:11CV260-

HEH, 2012 WL 3257876 (E.D. Va. Aug. 8, 2012); Burns v. Comm'r of Soc. Sec., No. 6:05-CV-825-ORL-DAB, 2006 WL 2348122, at *3-5 (M.D. Fla. Aug. 11, 2006) (finding that the ALJ erred in discrediting a treating physician's opinion based on "inconsisten[cies] with the record when considered in its entirety" where such inconsistencies could have been attributed to new evidence of the claimant's worsening condition). In considering this question in the present case, the Court notes that the Commissioner sets out five contentions as to why the ALJ properly discounted Dr. Jonas' treating physician opinion. (Def. Br. [Doc. #17] at 10-15.) The Court therefore considers each of the five contentions in turn.

First, the Commissioner contends that "treatment notes contradict Dr. Jonas' opinion and undermine the notion that Plaintiff's impairments rendered her 'unable to work.'" (Def. Br. at 10.) In support of that contention, the Commissioner cites treatment notes from 2009 and 2010, as well as a treatment record for February 2011 related to Plaintiff's diagnosis for Hepatitis C. (Id. at 10-12 (citing Tr. at 375-76, 385-88, 390-94, 400).) The Commissioner notes that Plaintiff's "arthritic symptoms were largely stable and alleviated by treatment." (Id. at 10.) The Commissioner concludes that "treatment notes dated *after* Plaintiff's alleged disability onset date (including those from Dr. Jonas), are inconsistent with Plaintiff's claims of debilitating arthritic limitations since June 2009 as the record demonstrates that her symptoms were minor in nature and alleviated by treatment." (Id. at 12 (emphasis in original).) However, this argument fails to address the treatment notes from mid-2011 forward. As noted by the ALJ,

> In April 2011, after the claimant reported an increase in symptoms, it was recommended that she be started on a new TNF inhibitor – Remicade. However, at her next visit in October 2011, Dr. Jonas noted it was not started due to insurance issues. The claimant reported increased pain and achiness in

her left hand, some pain in her right hand, and persistent difficulty with swelling in her feet and pain in both ankles. Upon examination, she had synovitis of the right third MCP, left third and fourth MCP, and both ankles, as well as decreased grip strength bilaterally. She had fairly good range of motion in her elbows and shoulders, with some stiffness, with 1+ edema in her extremities. Dr. Jonas noted for the first time that she believed the claimant's disease was "inadequately controlled on her current medical regimen."

In 2012, her primary care provider, Dr. Smith, noted positive findings upon examination including right ankle and knee pain with decreased range of motion and swelling as well as bilateral hand pain with digit edema and erythema with tenderness of the right second digit in both her hand and toe. . . .

At her next visit with Dr. Jonas in February 2012, the claimant reported that she had taken three doses of Remicade, but was not sure it was helping. The claimant reported ongoing symptoms, but specifically reported it had been a "bad week." She reported swelling in the left ankle as well as swelling and pain in both hands and more headaches than usual. Upon examination, she had some stiffness in her neck, fairly good range of motion in her shoulders, some tenderness in her left elbow, and synovitis of both wrists and multiple MCP joints and a few PIP joints. Her grip strength was also diminished. She had good range of motion in her hips, but also had crepitus in her knees, and synovitis of the left ankle. Dr. Jonas increased her Remicade and changed the interval to every six weeks. She was also continued on sulfasalazine and Plaquenil.

By August 2012, it was noted that the claimant continued to have significant disease activity. In July, she had a flare of the left second MCP joint and was injected with corticosteroids with good symptomatic benefit, but then symptoms recurred on the right. It was also noted the claimant had multiple flares and required corticosteroid tapers over the last six weeks. At that appointment, she reported pain in the right knee and the right third MCP. She continued to have findings in her hands, with diminished grip strength. There was also puffiness of both ankles and some tenderness in the small joints of her feet, but no edema in her extremities. Dr. Jonas discussed the claimant's options for treatment and noted she has had inadequate response to medications and that her history of hepatitis C complicated her therapy. They decided on a trial of rituximab.

Thereafter, in November 2012, she reported improvement and that her right foot and knee were both in better shape. However, she reported ongoing difficulty with her hands and that her right wrist is always inflamed, her second and third digits on both hands are always swollen and painful, and she had decreased range of motion and inability to make a full fist. Dr. Jonas noted

12

improvement since receiving rituximab and noted they would wait a few more
months before determining its efficacy.

(Tr. at 24-25). In addition to the information included in the ALJ's summary, the Court notes
that Dr. Jonas' April 2011 treatment note reflects that Plaintiff was suffering from "profound
fatigue," as well as consistent pain and synovitis in her hands with markedly diminished grip
strength. (Tr. at 426-27.) X-rays in April 2011 showed swelling, narrowing, and erosions in
the joints of her hands and feet, consistent with involvement by rheumatoid arthritis. (Tr. at
436-37.) Plaintiff underwent Remicade infusions in November 2011, December 2011, January
2012, February 2012, April 2012, May 2012, and July 2012. (Tr. 582, 580, 578, 576, 574, 572,
570.) The notes reflect that Plaintiff reported frequent headaches after the first infusion, and
more headaches and side effects after the second and third infusions. (Tr. 580, 532.) As
reflected in the November 2012 treatment records, she ultimately had "inadequate response"
to the Remicade, and Dr. Jonas switched her to rituximab in September 2012. (Tr. at 524.)
She tolerated the infusions of rituximab, but did have "bad headaches" around that time. (Id.)
Dr. Jonas decided to wait to assess the efficacy of rituximab before trying another biologic
therapy. (Tr. at 525.) Within a few weeks after that November 2012 appointment, Dr. Jonas
provided her January 2013 opinion, noting that Plaintiff had been under her care since 2008
for what was ultimately diagnosed as seropositive rheumatoid arthritis:

> RA is a chronic form of arthritis that is characterized by joint stiffness, joint
> pain, joint swelling, and profound fatigue. If untreated, RA can cause severe
> joint destruction and marked functional problems.
>
> Ms. Moore is currently being treated aggressively with a combination of
> medications including hydroxychloroquine, sulfasalazine, and Rituximab. She
> has previously been treated with Etanercept, Adalimumab, and Infliximab with
> inadequate benefit. She has been compliant with her therapy and all follow up

visits. Despite this, she continues to have significant functional limitations due to RA.

Ms. Moore is unable to perform repetitive tasks using her arms or hands due to active inflammation of the joints. She is unable to grip, finger, or handle for more than 1 hour at a time. She is not able to lift more than 10 pounds on a regular basis. She is unable to stand or walk for more than 30 minutes at a time for more than 2 hours. She is troubled with profound fatigue which requires frequent breaks and rest.

Even in patient[s] whose disease is well controlled, RA may be characterized by flares of disease activity which are unpredictable. When disease flares, there is increased pain, swelling, and stiffness of joints. This leads to functional disability requiring time off from work. Given that Ms. Moore's arthritis continues to be poorly controlled, I feel that she is unable to work.

(Tr. 501.) Neither the ALJ's decision nor the Commissioner's Brief cites any basis to conclude that Dr. Jonas' 2013 opinion is inconsistent with the treatment notes from mid-2011 through the end of 2012.[4] The Commissioner instead relies on inconsistencies between the 2013 opinion and the 2009-2010 treatment notes. However, the ALJ's decision acknowledges an increase in symptoms in mid-2011 (Tr. at 25, 28), and the treatment notes themselves reflect that Plaintiff's rheumatoid arthritis was initially controlled on Enbrel but "broke through" in 2011. (Tr. at 524, 526, 530, 532.) In the circumstances, the Commissioner's contention that the 2013 opinion was inconsistent with treatment notes from 2009 and 2010, when Plaintiff's

---

[4] The ALJ does state that "even Dr. Jonas' most recent treatment notes do not document objective findings that are consistent with the limitations as outlined in her most recent statement." (Tr. at 27.) However, the ALJ does not identify any inconsistencies or provide any additional explanation or analysis for that general statement. Moreover, the treatment notes include objective findings of uncontrolled seropositive rheumatoid arthritis, efforts at treatment involving multiple powerful medications, and persistent swelling, pain, and synovitis in Plaintiff's hands, feet, and ankles, as well as reduced grip strength, all over a 20-month period from April 2011 to November 2012, as discussed further as part of the Commissioner's fifth contention, infra. In addition, the ALJ states that the treatment notes "do not document consistent reports of fatigue." (Tr. at 27.) However, as noted above, the records do include at least some reports of fatigue, Plaintiff testified to her fatigue, and Dr. Jonas explained that rheumatoid arthritis is characterized by chronic fatigue. Thus, it is not clear how the treatment records are inconsistent with the 2013 opinion.

condition was stable and still controlled by medication, ultimately would not appear to provide a substantial basis for discounting the 2013 treating physician opinion.

The Commissioner next contends, as the second contention, that Dr. Jonas' 2013 opinion was "inconsistent with Plaintiff's continuous employment and her daily living activities." (Def. Br. as 12.) Indeed, this seems to be the primary basis for the ALJ's determination, as reflected in the decision itself. Specifically, the ALJ concluded that Dr. Jonas' "more recent residual functional capacity is not consistent with the claimant's reported activities of daily living, which include continuing to work on a part-time basis, caring for her children, cooking, driving, and performing light house work," and the ALJ further stated that Plaintiff's admission "in her function report that she could 'maybe' lift up to twenty pounds . . . is inconsistent with Dr. Jonas' opinion." (Tr. at 27; see also Tr. at 25, 28.) However, with respect to Plaintiff's activities of daily living, the ALJ relied almost exclusively on a function report completed by Plaintiff on November 1, 2010, to dispute evidence offered by both Plaintiff and her physicians regarding her abilities over a year, or even two years, later, when her symptoms and limitations had clearly increased. (Tr. at 26 (citing Exhibit 3E, Tr. at 249-56).) In an updated report in July 2011, Plaintiff reported that her symptoms had "gradually gotten worse" and that she had trouble opening jars and doors, that she was "dropping things constantly" because of a lack of grip, that she had difficulty washing dishes, buttoning buttons, vacuuming, and wiping counters, and that trying to do her own hair was a "nightmare." (Tr. at 272-273.) She stated that her ten-year-old daughter helped her with her hair, with buttons and clasps, and with cleaning. (Tr. at 276.) Plaintiff also noted that she suffered from severe fatigue and could only stand or sit for a short time. (Tr. at 272, 276.) At the July 2013 hearing,

Plaintiff testified that she could still drive and that she drove 3 or 4 days in a week, but that she could not sit or stand for more than 30 minutes at a time, and that she could no longer lift a gallon of milk. (Tr. at 56, 73.) She also testified that she had trouble buttoning her clothes, and that she had trouble holding a fork or pencil and had to use only the three fingers in her left hand. (Tr. at 74.) She testified that she went to church when she could, could not remember the last time she had been to a movie, visited with friends 2 or 3 times per month, and went to the grocery store once a week. (Tr. at 76-77.) She testified that she cooked sometimes and would sweep "a little," but did not vacuum or mop. (Tr. at 77.) It is not clear how the limited activities described in Plaintiff's testimony are inconsistent with Dr. Jonas' 2013 opinion, and as noted above, the inconsistencies cited by the ALJ appear to relate to the 2010 function report.

Similarly, with respect to Plaintiff's part-time work, the ALJ stressed Plaintiff's continued ability to work ten to twelve hours per week as a legal assistant as evidence that she could also maintain full-time employment, ignoring Plaintiff's undisputed testimony that, at the time of her hearing in January 2013, she could no longer perform most of the job duties previously described, that she required help to lift heavy books, and that she was allowed to work at her own pace and on her own schedule. (Tr. at 78-85.) At the hearing, Plaintiff's counsel noted that her employer was an attorney for whom she had worked many years ago, and the attorney continued to try to provide her with "a little bit of work" so she could "keep her lights on and keep some bread on the table," although it was becoming more and more difficult for her to do the work even with accommodations. (Tr. at 51.) Plaintiff's counsel also noted that Plaintiff sometimes works from home and she makes her own schedule for

the 10 to 12 hours per week that she tries to work. (Id.) For her part, Plaintiff testified that her hands were swollen and painful, and that several fingers could not fully bend. As a result, she could use a computer in a modified way, but she could not use her right hand or her left pointer finger, and instead used only the other three fingers on her left hand to type; thus, she could proceed only at a very slow pace, likely 15-20 words per minute rather than her prior pace of 90 words per minute. (Tr. at 65-68, 74, 79.) Plaintiff also testified that her work involved using the 15- to 20- pound books in the estates division at the courthouse, but that she had trouble lifting the books and the clerks would come in to help her because they had known her for so long and tried to help out. (Tr. at 63.) This testimony appears consistent with Dr. Jonas' contemporaneous opinion and treatment notes. It is also consistent with Plaintiff's update in May 2012, indicating that she went into the office only 2 days per week for 4 hours each day, and otherwise worked from home an additional 3 hours per week. (Tr. at 170.) Notably, her employer provided a letter in August 2012, stating that they had "noticed a difference in the past few weeks in the quality of work which could be contributed to her rheumatoid arthritis" and that "[h]er rheumatoid arthritis has caused her joints to swell making it difficult to walk and grab items which are visibly seen." (Tr. at 294.) In her own letter from August 2012, Plaintiff stated that her job is suffering because it is difficult to concentrate due to pain, and Plaintiff noted that her employer allows her to work from home to accommodate her impairments. See 20 C.F.R. § 404.1573; SSR 84-25, 1984 WL 49799 (noting that consideration of work activity includes consideration of whether the work may have been "done under special conditions," such as receiving special assistance from other employees in performing her work, the ability to work irregular hours and take frequent rest periods, being

permitted to work at a lower standard of productivity and efficiency than other employees, and whether the opportunity was provided despite her impairment because of a past association with the employer and the employer's concern for her welfare).[5]

In the circumstances, to the extent the ALJ discredited Dr. Jonas' 2013 opinion and Plaintiff's testimony based on inconsistencies with her 2010 function report and her part-time work activity, the Court cannot conclude the decision is supported by substantial evidence, given the undisputed evidence of the exacerbation of her symptoms beginning mid-2011. <u>See Krueger v. Comm'r of Soc. Sec.</u>, No. CV 15-10393, 2015 WL 9267172, at *10 (E.D. Mich. Oct. 19, 2015) (finding that the ALJ erred by discrediting the claimant's December 2013 hearing testimony regarding daily activities based on inconsistencies with November 2012 function reports, and stating that "the ALJ appears not to have considered that more than one year passed between the time the reports were completed (in November 2012) and the time of the hearing (in December 2013), and how the medical evidence in the record during that interim period of time supported or belied the prior evidence.") <u>report and recommendation adopted,</u> No. CV 15-10393, 2015 WL 9258436 (E.D. Mich. Dec. 18, 2015).

The Commissioner next contends, as the third contention, that "Dr. Jonas' conclusory opinions are also inconsistent with the RFC formulated by state agency consultant Perry Caviness, M.D." (Def. Br. at 13.) However, Dr. Caviness made his assessment in May 2011, and obviously did not have before him the later treatment records for 2011 and 2012. Therefore, Dr. Caviness' opinion reflects Plaintiff's condition only through early 2011, and in

---

[5] The ALJ's selective discussion of evidence related to Plaintiff's work activities also potentially runs afoul of the Fourth Circuit's recognition that an ALJ must not "'select and discuss only that evidence that favors his ultimate conclusion.'" <u>Hines,</u> 453 F.3d at 565-66 (quoting <u>Diaz v. Chater,</u> 55 F.3d 300, 307 (7th Cir. 1995)).

granting great weight to this assessment, the ALJ failed to adequately account for the lapse of time between the May 2011 assessment and the July 2013 hearing over two years later. See Whyte v. Comm'r, Soc. Sec. Admin., 2014 WL 4899775 (D. Md. Sept. 26, 2014) ("Discounting medical opinions due to temporal inconsistencies alone ignores the reality that symptoms can change over time."); Crotreau v. Colvin, 2014 WL 2505648 (D.S.C. May 14, 2014) ("On remand, the ALJ should consider this intervening record evidence of Plaintiff's worsening cervical spine stenosis and increasing hand numbness and determine whether the inconsistency of Dr. Sarb's and Dr. Ramon's opinions may reflect nothing more than a progression and deterioration of Plaintiff's cervical spine condition."). Thus, to the extent the undisputed evidence reflects an exacerbation in Plaintiff's symptoms in mid-2011, any inconsistency with the 2011 RFC would not necessarily provide a basis for discounting the 2013 opinion of Dr. Jonas.

As the fourth contention, the Commissioner asserts that "Dr. Jonas' opinions are inconsistent with documented recommendations from treating physicians (including Dr. Jonas) that Plaintiff increase her level of exercise." (Def. Br. at 14.) However, the exercise recommendations cited by the Commissioner are included in treatment records in 2009 and 2010. Again, given the increase in Plaintiff's symptoms in 2011 and the failure of the medication to continue to keep the symptoms under control, the references to exercise in treatment records two or three years earlier would not appear to be a basis for discounting Dr. Jonas' 2013 opinion.

Finally, as the fifth contention, the Commissioner asserts that "Dr. Jonas' opinions are also provided without objective or clinical supporting evidence and appear entirely based on

Plaintiff's own subjective claims." (Def. Br. at 14.) On this issue, the ALJ's decision states that "even Dr. Jonas' most recent treatment notes do not document objective findings that are consistent with the limitations as outlined in her most recent statement." (Tr. at 27.) However, no further explanation or analysis is included to specify the basis for this conclusion, and the ALJ elsewhere acknowledges that treatment notes after mid-2011 "do include some objective findings." (Tr. at 25.) On review, Dr. Jonas and Dr. Smith's treatment notes reflect that Plaintiff has been diagnosed with seropositive rheumatoid arthritis, that x-rays confirmed changes in the joints indicating rheumatoid involvement, that Plaintiff was treated with powerful medications, including high dosage infusions every 6 weeks, and that physical examinations from April 2011 through November 2012 indicate synovitis of both ankles, both wrists, and multiple MCP joints and PIP joints; decreased grip strength bilaterally; Dupuytren contracture of the left hand; extremity edema; bilateral shoulder stiffness; bilateral crepitus of the knees; tenderness and thick calluses over several hand and foot joints; some loss of range of motion in the neck, wrists, and digits; knee, ankle, hand, and foot swelling; elbow tenderness; and a painful nodule in the right third flexor tendon of Plaintiff's palm. (Tr. at 426, 458, 464, 468, 471, 474-78, 491, 496-97, 570, 572, 574, 576, 578, 580, 582.) The ALJ offers no explanation as to how this evidence fails to provide objective or clinical supporting evidence, or how this evidence otherwise conflicts with the physical limitations posited by Dr. Jonas in her January 2013 letter.

Ultimately, the Court concludes that the ALJ failed to consider the impact of Plaintiff's deteriorating condition in weighing Dr. Jonas' 2013 treating physician opinion. Specifically, it appears that the ALJ improperly rejected the 2013 opinion because it was inconsistent with

treatment records, an RFC analysis, and a function report, all from 2009 through early 2011, without sufficiently reconciling the evidence that Plaintiff's condition was stable and controlled through mid-2011 but subsequently involved an increase in symptoms. The only basis given by the ALJ to reject the later evidence was Plaintiff's "fairly active lifestyle" and her ability to continue to "work and perform activities of daily living despite her impairments." (Tr. at 25, 28.) However, as discussed above, in reaching that determination, the ALJ relied on Plaintiff's 2010 function report, and did not consider the evidence of her employer's accommodations and her decreasing ability to perform even 12 hours per week. In the circumstances, it appears that remand is required so that the ALJ can address these issues, and can consider whether a new examination or assessment is necessary in order to fully develop the record. See Pierce v. Astrue, No. 09-CV-813 GTS/VEB, 2010 WL 6184871, at *6 (N.D.N.Y. July 26, 2010) (finding that the ALJ was required to more fully develop the record where, in the face of the claimant's worsening condition, the ALJ discounted a more recent medical opinion in favor of a medical assessment completed prior to the claimant's condition having worsened) report and recommendation adopted, No. 5:09-CV-0813 GTS/VEB, 2011 WL 940342 (N.D.N.Y. Mar. 16, 2011); Clayborne v. Astrue, No. 06 C 6380, 2007 WL 6123191, at *5 (N.D. Ill. Nov. 9, 2007) (finding that the ALJ erred by failing to "further develop the record by ordering a second consultative examination," where medical records reflected an additional diagnosis and change in condition after the initial consultative examination); Burns, 2006 WL 2348122, at *5 (stating that "it was error for the ALJ not to order a new consultative examination . . . and to rely on [an] outdated . . . assessment . . . ."); see also 20 C.F.R. § 404.1519a(b) (providing that a consultative examination may be obtained when "[t]here is an

indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established"). In addition, to the extent that evidence of Plaintiff's increasingly disabling arthritis symptoms create the potential for a later onset date within the period currently at issue, the ALJ can consider the need for consultation with a medical advisor. See Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995); see also Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 345 (4th Cir. 2012); SSR 83-20, 1983 WL 31249.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #16] should be DENIED, and Plaintiff's Motion for Summary Judgment [Doc. #9] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 15th day of March, 2016.

              /s/ Joi Elizabeth Peake
              United States Magistrate Judge